### UNITED STATES DISTRICT COURT FOR
### THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARRY TRESCH, ) | |
| ) | |
| Plaintiff, ) | Case No. _____ |
| ) | |
| v. ) | JURY TRIAL DEMANDED |
| ) | |
| AMPLIFY ENERGY CORP, KENNETH ) | |
| MARIANI, DAVID H. PROMAN, DAVID M. ) | |
| DUNN, CHRISTOPHER W. HAMM, P. ) | |
| MICHAEL HIGHUM, EVAN S. LEDERMAN, ) | |
| EDWARD A. SCOGGINS JR., and SCOTT ) | |
| HOFFMAN, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against  Amplify Energy Corporation ("Amplify" or the "Company")  and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Amplify, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed merger of Amplify with Midstates Petroleum Company, Inc.

("Midstates") and Midstates Holdings, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On May 5, 2019, Amplify entered into an agreement and plan of merger (the "Merger Agreement"), whereby stockholders of Amplify common stock will receive 0.933 shares of Midstates common stock for each share of Amplify common stock they own (the "Merger Consideration").

3.      On June 28, 2019, in order to convince Amplify's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections and related analyses completed by Amplify's financial advisor with respect to the Proposed Transaction, UBS Securities, LLC ("UBS"); (ii) the data and inputs underlying the financial valuation performed by UBS; (iii) potential conflicts of interest on the part of UBS; and, (iv) potential conflicts of interest on the part of the Individual Defendants.

5.      The special meeting of Amplify's stockholders to vote on the Proposed Transaction will take place on August 2, 2019 and consummation of the Proposed Transaction will follow thereafter (the "Stockholder Vote").  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Stockholder Vote so Amplify's stockholders can properly exercise their corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Amplify's

public common stockholders sufficiently in advance of the upcoming stockholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Amplify's common stock trades on OTCQX, a market that is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff Barry Tresch is, and has been continuously throughout all times relevant hereto, the owner of Amplify common stock.

11.     Defendant Amplify is a Delaware corporation and maintains its principal executive office at 500 Dallas Street, Suite 1600, Houston, Texas 77002.  Amplify "is an independent oil and natural gas company engaged in the acquisition, development, exploitation and production of oil and natural gas properties located in the Rockies, federal waters offshore Southern California, East Texas / North Louisiana and South Texas."  Proxy, 1.  The Company's common stock trades on the OTC under the ticker symbol "AMPY."  *Id.*

12.     Individual Defendant Kenneth Mariani ("Mariani") is and has been Amplify's President and Chief Executive Officer and a member of its Board since May 14, 2018.

13.     Individual Defendant David H. Proman ("Proman") is and has been a member of Amplify's Board since May 2017.  Proman is also and has been a member of Midstates' board since November 2018.  Proman is also a Managing Director of Fir Tree Capital Management, which together with its affiliates owns 6,673,865 shares of Amplify common stock.

14.     Individual Defendant David M. Dunn ("Dunn") is and has been a member of Amplify's Board since March 2018.  Dunn is also a Managing Partner of Cross Sound Management LLC, which together with its affiliates holds 1,310,169 shares of Amplify common stock.

15.     Individual Defendant Christopher W. Hamm ("Hamm") is and has been a member of Amplify's Board since May 2017.  Hamm is also the Chief Executive Officer of Axys Capital Management, an affiliate of Axys Capital Income Fund, LLC, which together with its affiliates holds 1,626,816 shares of Amplify common stock.

16.     Individual Defendant P. Michael Highum ("Highum") was a member of Amplify's Board between May 2017 and March 22, 2019, when he resigned from the Board during the Company's merger negotiations with Midstates.

17.     Individual Defendant Evan S. Lederman ("Lederman") is and has been a member of Amplify's Board since May 2017.  Lederman is also and has been a member of Midstates' board since November 2018.  Lederman is also a Managing Director of Fir Tree Capital Management, which together with its affiliates owns 6,673,865 shares of Amplify common stock.

18.     Individual Defendant Edward A. Scoggins, Jr. ("Scoggins") is and has been a member of Amplify's Board since May 2017.

19.     Individual Defendant Scott Hoffman ("Hoffman") is and has been a member of Amplify's Board since March 22, 2019.  Hoffman is also a Senior Analyst at Brigade Capital Management, LP, which together with its affiliates owns 4,873,203 shares of Amplify common stock.

20.     The defendants identified in Paragraphs 12 through 19 above are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Amplify, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21.     According to its Website, Amplify "was formed to own, develop and exploit oil and gas properties in the United States.  The company's properties primarily consist of operated working interests in producing and undeveloped leasehold acreage and in identified producing wells in North America.  The company also owns non-operated working interests in producing and undeveloped leasehold acreage."

22.     Amplify is the successor reporting company of Memorial Production Partners LP ("MEMP"), and was formed in March 2017 in connection with the Chapter 11 Bankruptcy reorganization of MEMP.  Proxy, 26.

23.     Amplify's growth since its inception in March 2017 has been exemplary.  As noted in its March 6, 2019 Press Release entitled *Amplify Energy Announces Fourth Quarter and Full Year 2018 Results, Year-End 2018 Provided Reserves and 2019 Guidance*:

> "During the fourth quarter of 2018, Amplify successfully executed its previously discussed plan to return capital to shareholders," said Ken Mariani, President and Chief Executive Officer of Amplify.  "Our stock tender offer allowed us to repurchase approximately 2.9 million shares of common stock for an aggregate purchase price of $35 million.  In addition, we have recently implemented an open market buyback program to repurchase up to $25 million as market conditions and compliance requirements allow."
>
> Mr. Mariani continued, "As we enter 2019, we plan to direct a large portion of our $60 million capital budget into our previously announced investment in our Bairoil Field, while also funding an increasing level of drilling activity in our non-operated Eagle Ford properties.  We are continuing to evaluate development opportunities in our lease blocks in federal waters offshore California and with our East Texas properties, and have the ability to adjust our budget as the year progresses.  Our solid operational and financial performance in 2018 gives us confidence that we can continue to execute strategically and enhance shareholder value in 2019.

24.     As the March 6, 2019 press release explained, Amplify was focused on several strategic recent initiatives, which would drive continued business expansion through strategic stock repurchasing and continued investment in certain of Amplify's properties and evaluation of development opportunities in federal waters offshore California and in East Texas.

25.     Indeed, during the Fourth Quarter of 2018, the Company repurchased 2,916,667 shares of common stock (approximately 12% of outstanding shares) via a tender offer at $12.00 per share, with an aggregate purchase price of approximately $35 million (excluding related fees and expenses), and had also recently implemented an open market share repurchase program of up to $25 million of Amplify's outstanding shares of common stock, with those repurchases

beginning on January 9, 2019.

26.     Therefore, the Proposed Transaction comes at a time when Amplify's recent and future success was not fully reflected by its share price.  The Proposed Transaction will "compensate" Amplify stockholders with Midstates stock that fails to adequately compensate them for the intrinsic value of their shares.

27.     Despite Amplify's intrinsic value and growth prospects, the Individual Defendants are agreeing to sell the Company and depriving its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiffs and the Class to receive an inadequate Merger Consideration.

**The Background of the Proposed Transaction**

28.     On August 15, 2018, the Amplify Board "held a regular meeting at which topics included the general state of the market for acquisitions and divestitures, as well as the desire to explore opportunities to make accretive asset acquisitions and leverage the management team's operational capabilities."  Proxy, 94.  "During such meeting, the Amplify board also discussed potential paths to improve Amplify stockholder value through increased efficiencies, with an emphasis on strengthening the company's liquidity profile, total stockholder return and sustainable free cash flow generation.  At the conclusion of the August Amplify board meeting, the Amplify board determined that it could be in Amplify's interest to pursue a strategic combination."  *Id.*

29.     On October 10, 2018, Amplify's Board and management team "met to discuss, at a preliminary level, certain exploration and production companies that could be potential

combination targets" based on "potential resulting cost synergies, balance sheet challenges, misalignment of stakeholders, asset alignment and incentives for consolidation. Based on these criteria, the Amplify board and management identified two potential primary counterparties, Midstates and Company H[.]" Proxy, 94-95.

30.     In October and November 2018, Amplify's management "met with a series of financial advisory firms." Proxy, 95. "The Amplify board agreed to engage an advisory firm to pursue an in-depth analysis of Midstates and Company H, with flexibility to adapt for new opportunities." *Id.*

31.     In October 2018, Midstates and representatives from Houlihan Lokey "conducted preliminary analysis of potential transactions involving Amplify as well as Companies D, E, F, and G." Proxy, 94. Midstates ruled out Company D based on its "asset base, recent drilling results and the capital required to further develop and delineate Company D's assets." *Id.* Midstates subsequently retained Houlihan Lokey in November 2018 "to lead a process of identifying the company's strategic alternatives." Proxy, 95.

32.     On November 7, 2018, "Midstates issued a press release and filed a Current Report on Form 8-K with the SEC that announced, among other things, that Midstates intended to pursue strategic and opportunistic transactions." Proxy, 95.

33.     Among the "other things" announced in this November 7, 2018 press release, was that Midstates was naming Lederman and Proman to Midstates' board effective immediately. *See* https://ir.midstatespetroleum.com/press-releases/detail/126/midstates-petroleum-announces-changes-to-its-board-of (accessed July 3, 2019). As of November 7, 2018, Proman and Lederman were members of Amplify's Board and had been members since Amplify's inception in March 2017.

34.     On November 17, 2018, "Lederman informed the Midstates board that he received an oral offer from Company E to purchase Midstates."  Proxy, 95.

35.     On November 18, 2018, Midstates formally engaged Houlihan Lokey as its financial advisor.  Proxy, 95.

36.     On December 12, 2018, "Amplify management addressed with the Amplify board recent business activities, including a recommendation for the advisor engagement."  Proxy, 95.

37.     Following the Amplify Board meetings in November and December 2018, "Company H was eliminated as a primary target because it no longer represented a viable counterparty.  In addition, during such time period, a third-party advisor representing Company I, another exploration and production company, approached Mr. Mariani."  Proxy, 96.  The Proxy does not detail why Company H "no longer represented a viable counterparty."

38.     On December 20, 2018, Sambrooks, "received an email from UBS offering an introductory meeting between Messrs. Sambrooks and Mariani."  Proxy, 96.  UBS was not formally engaged to act as Amplify's financial advisor until January 7, 2019, about three weeks after UBS sent this email to offer the "introductory meeting.", Amplify initiated preliminary discussion with Midstates and Company I and conducted initial reviews of the potential counterparties' assets.

39.     On January 7, 2019, Amplify engaged UBS to act as Amplify's financial advisor, and "Messrs. Sambrooks, Redfield and Mariani met in person and discussed a possible business combination between Midstates and Amplify."  Proxy, 96.  Shortly thereafter, "Midstates and Amplify entered into a mutual confidentiality and non-disclosure agreement, following which time the parties began exchanging data and information to assist each other and their financial advisors in their preliminary efforts to explore a possible business combination."  *Id.*

40.     On January 22, 2019 Sambrooks and Mariani, along with Amplify's and Midstates' financial advisors, had another meeting "to provide an overview of their respective companies and assets, as well as to discuss strategic objectives." Proxy, 96.

41.     On January 23, 2019, Mariani and UBS met with Company I's chief executive officer and its financial advisor to "share an overview of their respective companies and assets, as well as to discuss strategic objectives." Proxy, 96. The Proxy does not state whether Amplify and Company I entered into a nondisclosure or confidentiality agreement at this time.

42.     On January 28, 2019, the Amplify Board received a non-binding proposal from Company I, expressing an interest in pursuing a stock-for-stock merger. Proxy, 97. The Proxy does not detail this proposal.

43.     The next day, January 29, 2019, the Amplify board met to discuss Company I's proposal. After external counsel "provided an overview to the Amplify board of its fiduciary duties and discussed certain considerations related to public transactions[,] the Amplify board recommended continuing with additional diligence on Midstates and Company I." Proxy, 97.

44.     On January 31, 2019, the Midstates board held a meeting to discuss the status of Midstates' ongoing acquisition and divestiture activities. "Lederman and Proman informed the members of the Midstates board of their affiliation with Amplify and Fir Tree Partners, their employer, and of Fir Tree Partners' ownership interest in Amplify." Proxy, 97. Fir Tree Capital Management owns approximately 30% of Amplify's common stock outstanding and 23% of Midstates common stock outstanding, and will control approximately 28% of the common stock of the combined company upon consummation of the Proposed Transaction. According to the Proxy, Lederman and Proman are managing directors of Fir Tree Capital Management but "do not have voting and investment power with respect to any shares of Amplify common stock

owned by [Fir Tree] in their capacities as managing directors of [Fir Tree]."

45.     On February 12, 2019, the Amplify board, Amplify's management team, and UBS "met to have a more in-depth discussion relating to a potential strategic business transaction with Midstates or Company I." Proxy, 97. "At this same meeting . . . Messrs Proman and Lederman fully disclosed their relationships with Midstates and acknowledged that these relationships could result in interests different than those of the disinterested Amplify directors, and therefore agreed to recuse themselves from discussions among the Amplify directors regarding the specific terms and conditions of any transaction with Midstates throughout  the remainder of the process.  The disinterested Amplify directors agreed that the two directors should be recused from all strategic and analytic discussion relating to a potential transaction with Midstates." *Id.*

46.     Also at the February 12, 2019 Amplify Board meeting, following the discussion regarding Lederman and Proman, "the disinterested Amplify directors discussed and concluded that a transaction with Midstates aligned with Amplify's strategic objectives for a combination, including, in particular, general and administrative cost synergies, accretive value for operating margins, balance sheet enhancements and the potential increase Amplify's stock float.  In addition, it was discussed at the meeting that Midstates' single basin asset would complement Amplify's existing diversified oil and gas asset portfolio." Proxy, 97.

47.     Also at the February 12, 2019 Amplify Board meeting, the Board "determined that a combination with Company I would likely not meet Amplify's goals[.]" Proxy, 97-98. "Mr Mariani and representatives from UBS contacted Company I and its advisor to indicate Amplify would not continue to pursue a transaction at that point in time." *Id.* at 98.

48.     The next day, February 13, 2019, Mariani and Sambrooks had a telephone call "to discuss the timing for each company's respective evaluation of a possible business combination

between Midstates and Amplify." Proxy, 98.

49.     On February 26, 2019, the management teams and financial advisors for Amplify and Midstates "met to discuss each company's desire to continue the dialogue regarding a potential business combination[.]" Proxy, 98.

50.     On March 8, 2019, "the disinterested members of the Amplify board met to discuss whether to submit a non-binding proposal to Midstates and the terms thereof.  . . . Following this discussion the disinterested directors determined it was in the best interest of Amplify to send Midstates a non-binding proposal for an all-stock merger in which Amplify stockholders would receive 54.1% of the equity in the combined company and Midstates stockholders would receive 45.9%." Proxy, 98.  Mariani sent this proposal to Sambrooks later that day. *Id.*

51.      On March 11, 2019, the Midstates board held a meeting to discuss and evaluate Amplify's March 8, 2019 offer and Company F's March 2, 2019 offer.  Lederman and Proman participated in the "initial portion" of the meeting and "offered to recuse themselves from the meeting as necessary." Proxy, 99.  "[B]oth of Messrs. Lederman and Proman recused themselves from the meeting and any further discussions or negotiations regarding the terms or conditions of a potential transaction between Amplify and Midstates." *Id.*

52.     At the March 11, 2019 Midstates board meeting, after discussing Houlihan Lokey's equity splits analysis and implied valuations, "the disinterested members of the Midstates board authorized Mr. Sambrooks to give Mr. Mariani a counteroffer proposing a merger equity split of 51% of the combined company's equity ownership to the Midstates stockholders and 49% of the equity to the Amplify stockholders. " Proxy, 99.

53.     The next day, Sambrooks sent a response to Mariani, proposing an equity split of

49% to Amplify stockholders and 51% to Midstates stockholders.  Proxy, 99.

54.     On March 15, 2019, members of the Amplify board (other than Lederman and Proman) met to discuss submitting a revised non-binding proposal to Midstates.  Later that day, Mariani responded to Sambrooks proposal with a proposal that "contemplated an all-stock transaction with an equity split in the combined company of 52.7% to Amplify stockholders and 47.3% to Midstates stockholders." Proxy, 99.  The non-binding proposal also described other terms, "including that the combined company would be headquartered at Amplify's Houston, Texas office, would have a seven-member board of directors (consisting of the chief executive officer of the combined company, two directors nominated by Midstates and four directors nominated by Amplify), and would operate under the Amplify name and brand.").

55.     On March 15 and 16, 2019 members of the Midstates board (other than Lederman and Proman) discussed and evaluated Amplify's March 15, 2019 proposal, determined that the proper equity split in a business combination with Amplify was 50/50.  Proxy, 100.  The Midstates board authorized Midstates board member Randal Klein ("Klein") to contact Defendant Dunn to discuss Amplify's proposal and Midstates' response.

56.     On March 19, 2019, the Amplify "decided that the governance proposal set out in Amplify's March 15, 2019 letter should not be revised and that a 51% / 49% ownership allocation in favor of Amplify stockholders was appropriate." *Id.*  Later that day, Dunn relayed this proposal to Klein, Klein indicated that Midstates' objective was a 50/50 split and "indicated that he thought the parties would be able to reach an agreement on the governance and social issues[.]" *Id.*  Dunn and Klein "agreed to propose that executive officers and certain advisors of both companies meet in person to discuss definitive terms of a potential transaction." *Id.*

57.     The Amplify board met again on March 21, 2019, and Dunn summarized his

discussion with Klein.  Proxy, 100.  At this meeting, the Amplify board members (other than Lederman and Proman) discussed Midstates' proposed 50/50 equity split, and "decided that if Amplify and Midstates were to reach a tentative agreement on these terms, then the management teams should meet in order to discuss the remaining commercial points[.]"  Proxy, 101.

58.      Highum resigned from the Amplify board the next day, March 22, 2019.  Proxy, 101.  That same day, Hoffman was appointed to the Amplify board.  *Id.*  The Proxy provides no explanation for Highum's apparently abrupt resignation, nor for Hoffman's apparently abrupt appointment.

59.      The executives and financial advisors for Midstates and Amplify met in-person on March 25, 2019.  Midstates and Amplify discussed several aspects of the potential business combination, including the possibility of a "potential return of capital."  Proxy, 101.  The Amplify board met on March 26, 2019, and further discussed Midstates' proposal of a 50/50 equity split. Proxy, 101-02.  After that board meeting, "representatives from each of UBS and Houlihan Lokey attended a social event at which Mr. Sambrooks was present" where "Sambrooks reiterated that Midstates would consider only a merger of equals transaction."  Proxy, 102.  The next day, March 27, 2019, Defendant Scoggins "had an informal conversation about the general status of the transaction with representatives from Houlihan Lokey at an industry event."  *Id.*

60.      At the April 1, 2019 Amplify board meeting, Mariani recommended "that Amplify accept a 50% / 50% equity split, but also requested that the parties consider some form of capital return to the stockholders of the combined company in the future, and if there was increased liquidity attributable solely to Amplify's pre-closing business, that some portion of that liquidity might potentially be used to return capital to legacy Amplify stockholders."  Proxy, 102-03.  UBS "presented pro forma analyses of various equity splits," and "also included an exchange ratio analysis based on the current and historic stock prices of the two companies."  Proxy, 103.  The

Amplify board reached a "consensus" to propose "50% ownership for each company's stockholders in the combined company and a post-closing capital return program." *Id.*

61.     On April 2, 2019, Sambrooks responded, "indicating that Midstates was agreeable to an all-stock merger of equals transaction in which each company's respective stockholders would receive 50% of the stock of the combined company.  Additional contingencies were discussed but were ultimately determined to not be in the best interests of the companies." *Id.*

62.     On April 3, 2019, the Amplify board (other than Lederman and Proman) met and agreed "to proceed with the transaction on the basis of a 50% / 50% equity split, subject to agreeing to terms on the definitive documentation and governance issues.  The Amplify board agreed to table a discussion of a return of capital until a later date." Proxy, 103.  The Amplify board further discussed "governance issues, such as board composition and size," and "instructed UBS representatives to conduct an analysis of capital market implications" and "the appropriateness of a short exclusivity period." *Id.*  Later on April 3, 2019, "Mariani and Sambrooks agreed that the companies should enter into a limited exclusivity agreement[.]" Proxy, 103.

63.     On April 4, 2019, Company F submitted a non-binding cash offer to acquire Midstates, which Midstates rejected "subject to the concurrence of Lederman and Proman. Proxy, 104.  Lederman and Proman confirmed that they concurred with rejecting Company F's offer. *Id.*

64.     On April 8, 2019, Amplify and Midstates "entered into an exclusivity agreement running through April 30, 2019" pursuant to which "neither Amplify nor Midstates would solicit or encourage a transaction with an alternative party."  Proxy, 104.

65.     On April 10, 2019, Amplify sent an initial draft merger agreement with a unilateral

termination fee to be paid by Midstates.  On April 12, 2019, Midstates responded to this draft by

sending a revised draft on April 15, 2019, which included a reciprocal termination fee.  Proxy,

104-05.  The merger proposals were structured such that Amplify's shareholders would not vote

on the merger.  *Id.*  On April 16, 2019, Amplify and Midstates "granted each other access to their

respective "virtual data rooms.""  Proxy, 105.

66.     On April 17, 2019, the Amplify board met to discuss the proposed merger and

Amplify's outside counsel "provided an update on the general terms and status of the draft merger

agreement."  Proxy, 105.  After Proman and Lederman left the meeting, the rest of Amplify's

board "discussed the merger agreement in greater detail," and "determined that Amplify should

maintain its governance proposal in which the board of directors of the combined company should

include four members to be named by Amplify, in addition to Mr. Mariani, as well as two

members to be named by Midstates."  *Id.*

67.     On April 24, 2019, Mariani and Sambrooks discussed the possibility "that a

closing condition regarding the listing of Amplify's stock on a national securities exchange posed

a potential risk, even if minimal, to the transaction," and the Amplify board determined on April

25, 2019 "that the combined company would benefit from succeeding to Midstates' existing

NYSE listing and directed the representatives from Kirkland in attendance to analyze the

potential impact of revising the merger agreement to reflect Midstates as the acquirer."  *Id.*

68.     On April 30, 2019, Amplify and Midstates extended the exclusivity agreement

through May 7, 2019.  Proxy, 106.

69.     Later on April 30, 2019, Midstates' outside counsel "sent a revised draft of the

merger agreement" that reflected "Midstates as the nominal acquirer and including a vote of both

the Midstates stockholders for approval of the equity to be issued in the merger and the Amplify

stockholders for approval of the merger, as well as termination fees for both parties." Proxy, 106.

70.     On May 5, 2019, Midstates' and Amplify's boards held separate meetings at which they discussed and approved the final terms of the proposed merger.  Proxy, 106-07. Midstates and Amplify each filed a Current Report on Form 8-K with the SEC to announce the merger on May 6, 2019.  Proxy, 107.

71.     On May 6, 2019, prior to the opening of trading, Amplify and Midstates issued a joint press release, which stated, in part:

> HOUSTON, May 06, 2019 (GLOBE NEWSWIRE) -- Amplify Energy Corp. (OTCQX: AMPY) ("Amplify") and Midstates Petroleum Company, Inc. (NYSE: MPO) ("Midstates") announced today that they have entered into a definitive merger agreement pursuant to which Amplify will merge with a subsidiary of Midstates in an all-stock merger-of-equals. Under the terms of the merger agreement, Amplify stockholders will receive 0.933 shares of newly issued Midstates common stock for each Amplify share of common stock.  The merger is expected to close in the third quarter of 2019, at which time Amplify and Midstates stockholders will each own 50% of the outstanding shares of the combined company.
>
> The combined company will be headquartered in Houston and trade on the NYSE under the ticker AMPY. Amplify's President and Chief Executive Officer Ken Mariani will lead the combined company. The new Board of Directors will include members who currently serve on the Amplify and Midstates Boards. A detailed presentation describing the rationale and merits of the merger can be found at www.amplifyenergy.com or www.midstatespetroleum.com.
>
> **Transaction Highlights**
>
> - Achieves benefits of scale by combining two PDP-weighted independent producers
>   - Pro forma total enterprise value >$720 million and market capitalization >$430 million[1]
>   - Pro forma 4Q18 production of ~40 MBoe/d
>   - Pro forma 4Q18 Annualized Adjusted EBITDA of ~$241 million
> - Strong balance sheet and liquidity that will allow for acceleration of capital return programs
> - Low-decline assets expected to generate 2019E levered free cash flow of at least $65 million, which results in a top-tier pro forma free cash flow yield >15%[2]
> - Maintains low-leverage with pro-forma leverage ratio of 1.2x[3]

- Expected annual G&A synergies of at least $20 million creates top-tier pro-forma G&A efficiency
- Combined company current enterprise value of $729 million before synergies is a significant discount to pro forma combined proved developed reserve value of $960 million (of which 95% is PDP) based on April 30, 2019 strip pricing
- Greater than 50% of Amplify and approximately 36% of Midstates' stockholders have committed to vote their shares in favor of the merger, pursuant to support agreements entered into in connection with the merger agreement

---

[1] As of May 3, 2019
[2] 2019E levered free cash flow yield = (2019E adjusted EBITDA – 2019E capital expenditures – 2019E interest expense) / market capitalization as of 5/3/19
[3] Combined net debt as of March 31, 2019 divided by annualized fourth quarter 2018 EBITDA

Mr. Mariani stated, "Amplify and Midstates are both well positioned to generate significant free cash flow from proved developed producing assets, and we believe that stockholders of both companies will benefit from the reduced costs and enhanced scale achieved by this transaction.  The combined company's strong balance sheet, liquidity and free cash flow create additional capacity to return capital to stockholders and support improved market performance.  In addition, we believe that there are significant benefits in continuing to increase scale in this market, and moving forward we intend to consider other opportunistic combinations and acquisitions that create value through cost synergies and free cash flow accretion."

David Sambrooks, President and Chief Executive Officer of Midstates, stated "This merger-of-equals with Amplify is exactly the type of value maximizing transaction we hunted for when we announced our strategic review process earlier this year.  The stock-for-stock combination provides for substantial value enhancing synergies and the potential to accelerate additional capital returns moving forward, creating significant value for shareholders of both Midstates and Amplify.  Ken and the Amplify management team have a demonstrated focus on capital discipline and capital returns to stockholders, while operating safely and efficiently and are well suited to run the combined Company."

**Transaction Details**

The merger agreement was unanimously approved by the participating directors of both boards.  The Midstates Board of Directors has recommended that the Midstates stockholders vote their shares in favor of the issuance of Midstates common stock to Amplify stockholders in connection with the merger and the

Amplify Board of Directors has recommended that the Amplify stockholders vote their shares in favor of the merger.

The transaction is subject to the terms and conditions set forth in the merger agreement, including holders of a majority of Midstates stock present at the special meeting having voted in favor of the stock issuance, holders of a majority of Amplify stock having voted in favor of the merger, the waiting period under the U.S. Hart-Scott-Rodino Act having expired or been terminated early, the Midstates stock being issued to Amplify stockholders in connection with the merger being listed on the NYSE and other customary conditions. Amplify sought, and has received, a technical consent from the lenders in its existing credit facility permitting the consummation of the merger.

**Advisors**

Amplify's financial advisor is UBS Investment Bank and its legal advisor is Kirkland & Ellis LLP. Midstates' financial advisor is Houlihan Lokey Capital, Inc. and its legal advisor is Latham & Watkins LLP.

72.     Rather than continuing to build upon Amplify's improving prospects, the Offer Consideration being offered to Amplify's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Amplify common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

73.     Indeed, Amplify entered the merger negotiations intent on obtaining a 54.1% / 45.9% equity split in favor of Amplify's stockholders.  Nonetheless, Amplify almost immediately abandoned its public shareholders in favor of its directors and insiders, readily agreeing to Midstates' demand for a putative merger of equals with a 50/50 equity split.

74.     Notwithstanding the nominal "merger of equals" tag, Amplify was clearly the driver of the merger.  Notably, the merger agreement adopted almost all of Amplify's positions regarding corporate governance, including:

- That the combined company board would have eight directors, including Proman and Lederman).  In addition to Proman and Lederman, who already serve on both

Amplify's and Midstates' boards, four of these directors are from Amplify but only two are from Midstates. The four Amplify board members are Hamm, Hoffman, Dunn, and Mariani.

- That Mariani, Amplify's current Chief Executive Officer, and the current Amplify management team will be responsible for the day-to-day operations of the combined company in the same or similar roles as they already hold with Amplify; and

- That the combined company should be headquartered at Amplify's current home base in Houston, Texas.

**The Preclusive Deal Protection Devices**

75.     To the detriment of Amplify shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

76.     Section 6.4 of the Merger Agreement is a restrictive "no-shop" provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

77.     Section 6.4(d) of the Merger Agreement also strictly prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

78.     Section 6.4(e) of the Merger Agreement requires the Board to provide Midstates with written notice of any Company Alternative Proposal within twenty-four (24) hours of its receipt. Section 5.2(c) required the Board to provide prior written notice within five (5) business

days of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Midstates following Midstates receipt of the notice, so that Midstates has the opportunity within five (5) business day to adjust the terms and conditions of the Merger Agreement so that the Company Acquisition Proposal ceases to be a Superior Proposal.

79.     In addition, the Merger Agreement provides that the Company will be required to pay to Parent a termination fee of $4.5 million to Midstates with respect to any termination under the No-Shop provisions of the Merger Agreement.

80.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for Amplify shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

81.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

82.     On June 28, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC.  The special meeting of Amplify stockholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed

voting decision in connection with the Proposed Transaction.  Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction and the Individual Defendants' potential conflicts of interest; and (ii) information regarding the assumptions and inputs that render UBS' fairness analysis materially false, misleading, or incomplete.

### A. The Proxy Omits Material Information Regarding the Background of the Proposed Transaction and the Individual Defendants' Potential Conflicts of Interest

83.     The Proxy fails to provide material information regarding the background of the merger that implicate potential conflicts of interest for Amplify's directors.

84.     The Proxy discloses that Amplify management met with "a series of financial advisory firms" in October and November 2018 and "agreed to engage an advisory firm to pursue an in-depth analysis of Midstates and Company H" but does not identify which firms management met with or which firm Amplify management "agreed to engage" or whether Amplify management met with and agreed to work with Houlihan Lokey and/or UBS at this time.  Further, the Proxy does not disclose whether the nature and subject of these engagements was subject to confidentiality agreements.

85.     The Proxy provides no details explaining the nature of or reasons for Highum's resignation during the pendency of the negotiations with Midstates.

86.     The Proxy further provides no details as to what extent, if any, Highum had ownership or control over Amplify stock throughout this period.

87.     The Proxy also provides no details regarding Hoffman's appointment to the Board during the pendency of the negotiations with Midstates.  As Hoffman is a principal at Brigade Capital Management, which controls almost 22% of Amplify's common stock outstanding and

Hoffman will continue to be a director of the combined company upon consummation of the Proposed Transaction, these details must disclosed.

88.     The Proxy states that Sambrooks "received an email from UBS" on December 20, 2018, but provides no details of who instructed UBS to send this email, nor which person at UBS actually sent it.  Further the Proxy discloses that, on January 7, 2019, "Messrs. Sambrooks, Redfield and Mariani met in person" but does not identify who Redfield is or why Redfield was at the January 7, 2019 meeting but (apparently) did not play any role in the negotiations otherwise.

89.     The Proxy states that Mariani and UBS met with Company I's chief executive officer and financial advisor on January 23, 2019, and that Company I subsequently made a non-binding stock-for-stock merger proposal to Amplify, but the Proxy fails to disclose whether Amplify and Company I had entered into a confidentiality agreement, and further fails to disclose any of the details of Company I's proposal.

90.     The Proxy states that Proman and Lederman "fully disclosed their relationships with Midstates" on February 12, 2019, and that the Amplify Board "agreed that the two directors should be recused from all strategic and analytic discussion relating to a potential transaction with Midstates" but does not disclose (i) why Proman and Lederman waited so long to disclose the conflicts of interest; (ii) whether Proman and/or Lederman steered negotiations towards Midstates prior to February 12, 2019; or (iii) whether Proman and/or Lederman steered negotiations away from other potential counterparties, including Company H and/or Company I before or after February 12, 2019.

91.     Indeed, the Proxy fails to disclose material information regarding the Amplify board's determinations that Company H and Company I did not represent viable counterparties that could make proposals competitive with Midstates, and does not state whether Lederman

and/or Proman made suggestions or recommendations that would militate against a transaction with Company H and/or Company I. Particularly with regard to Company H, the Proxy contains virtually no details regarding this determination.

92.     The Proxy states that, the Midstates board held a meeting on March 11, 2019 to discuss and evaluate Amplify's March 8, 2019 offer and Company F's March 2, 2019 offer and states that Lederman and Proman "recused themselves from the meeting and any further discussions or negotiations regarding the terms or conditions of a potential transaction between Amplify and Midstates" but does not state whether Lederman and Proman acted to steer Midstates away from Company F's proposal during the "initial portion" of the meeting in which they participated.

93.     The Proxy discloses that, on March 26, 2019 "representatives from each of UBS and Houlihan Lokey attended a social event at which Mr. Sambrooks was present" where "Sambrooks reiterated that Midstates would consider only a merger of equals transaction" but does not disclose whether this "social event" was organized with the express purpose of engaging UBS, Houlihan Lokey, and Sambrooks. The Proxy also discloses that Defendant Scoggins "had an informal conversation about the general status of the transaction with representatives from Houlihan Lokey at an industry event" on March 27, 2019 but likewise does not disclose the nature of the "industry event" or whether Scoggins and Houlihan Lokey attended the event with the purpose of engaging in this "informal conversation."

94.     The Proxy does not disclose why the Amplify Board abandoned its push for a post-closing capital return program for legacy Amplify shareholders.

**B. The Proxy Omits Material Information Regarding Financial Projections, Inputs, and Assumptions for Various Financial Valuations and Amplify's Financial Advisors' Potential Conflicts of Interest**

95.     The Proxy fails to provide enough information regarding the fairness analysis. Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and UBS' potential conflicts of interest.

96.     In particular, the Proxy fails to disclose: (a) all line items used to calculate EBITDA; (b) a reconciliation of all non-GAAP to GAAP metrics; (c) with respect to the *Discounted Cash Flow Analysis*: (i) the projected post-tax unlevered free cash flows, (ii) the estimated terminal value, (iii) the reasons why a range of exit multiples was used with respect to adjusted EBITDA, (iv) the reasons why or the individual inputs and assumptions used underlying the range of discount rates and perpetuity growth rates applied, (v) the existence of net debt, and (vi) the number of (fully diluted) shares of Amplify common stock; (d) with respect to the *Selected Public Companies Analysis*, the price targets (and sources of said targets) for Amplify; (e) with respect to the *Selected Transactions Analysis*, the premiums paid in each of the transactions; and (f) with respect to potential conflicts of interest related to UBS, details of the work that UBS performed for Amplify prior to work related to the Proposed Transaction and the fees paid to UBS for the aforementioned work performed prior to work related to the Proposed Transaction.

97.     With respect to the disclosures related to EBITDA, Defendants' failure to disclose all line items used to calculate renders the Proxy materially misleading.

98.     With respect to the reconciliation of all non-GAAP to GAAP metrics, Defendants' failure to reconcile all non-GAAP to GAAP metrics similarly renders the Proxy materially misleading.

99.     With respect to the *Discounted Cash Flow Analysis*, investors are concerned, perhaps above all else, with the projections and cash flows of the companies in which they invest.

Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's stockholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear: Is the Merger Consideration fair compensation given Amplify's projected cash flows? Without the line items underlying Amplify's unlevered free cash flows, the Company's stockholders will not be able to properly assess this critical question and evaluate the fairness of the Merger Consideration.

100. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections relied upon by UBS, but have omitted crucial line items and reconciliations. Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

101. With respect to UBS' *Discounted Cash Flow Analysis*, the Proxy is also materially misleading and incomplete because it fails to disclose the inputs and assumptions underlying the selection of the range of discount rates and the terminal growth rates underlying the selection of terminal multiples, and instead simply states the "range was selected by UBS in its professional judgement." Moreover, UBS' *Discounted Cash Flow Analysis* is based on unlevered free cash flows, but omits the critical line items as discussed above, nor does the *Discounted Cash Flow*

*Analysis* disclose the fully diluted shares outstanding of Amplify.

102.    These key inputs are material to Amplify stockholders, and their omission renders the summary of UBS' *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***.  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).   Without the above-mentioned information, Amplify's stockholders cannot meaningfully evaluate for themselves the reliability of UBS' *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of an unreasonable judgment by UBS, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

103.    With respect to the *Selected Public Companies Analysis*, UBS' analysis is also materially misleading.  Specifically, it fails to disclose the critical price targets for Amplify or the sources thereof.

104.    The *Selected Transactions Analysis* prepared by UBS in the Proxy is similarly insufficient and materially misleading.  Specifically, it fails to disclose the details, including premiums and otherwise of the transactions observed by UBS and what premiums were paid in those transactions.

105.    Finally, with respect to potential conflicts of interest related to UBS, details of the work that UBS performed for Midstates and its affiliates and Amplify prior to work related to the Proposed Transaction and the fees paid to UBS for such work.  As UBS was not formally engaged to act as Amplify's financial advisor until January 7, 2019, about three weeks after UBS the email to Sambrooks to offer the "introductory meeting between Messrs. Sambrooks and Mariani," the failure to disclose what (if any) work UBS performed on Midstates' behalf is of critical importance for shareholders in determining to what extent, if any, they may rely on UBS' fairness opinion.

106.    Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

107.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming stockholder vote concerning the Proposed Transaction, Plaintiff and Amplify's other public shareholders will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9)**

108.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

109.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the

use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to

section 78l of this title."  15 U.S.C. § 78n(a)(1).

110.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that Proxy communications shall not contain "any statement which, at the time and

in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading."  17 C.F.R. § 240.14a-9.

111.     The omission of information from a Proxy will violate Section 14(a) and Rule

14a-9 if other SEC regulations specifically require disclosure of the omitted information.

112.     Defendants have issued the Proxy with the intention of soliciting the Company's

common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants

reviewed and authorized the dissemination of the Proxy, which fails to provide critical

information regarding, amongst other things: (i) complete and accurate financial projections for

Amplify; (ii) complete and accurate valuation analyses performed by UBS in support of its fairness opinion; and (iii) potential conflicts of interest on the part of the Individual Defendants and UBS with respect to the Proposed Transaction.

113.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

114.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that UBS reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by UBS, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

Indeed, the Individual Defendants were required to, separately, review UBS' analyses in connection with their receipt of the fairness opinions, question UBS as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

115.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

116.    Amplify is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

117.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Stockholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

118.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

119.     The Individual Defendants acted as controlling persons of Amplify within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Amplify, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

120.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

121.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

122.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or

gave their input on the content of those descriptions.

123.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

124.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

125.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Stockholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.    Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: July 19, 2019                                    **MONTEVERDE & ASSOCIATES PC**

                                                        By:   _/s/ Juan E. Monteverde_____
**OF COUNSEL:**                                             Juan E. Monteverde (JM-8169)
                                                            The Empire State Building
**ADEMI & O'REILLY, LLP**                                   350 Fifth Avenue, Suite 4405
Guri Ademi                                                  New York, NY 10118
3620 East Layton Avenue                                     Tel:(212) 971-1341
Cudahy, Wisconsin 53110                                     Fax:(212) 202-7880
Tel: (414) 482-8000                                         Email: jmonteverde@monteverdelaw.com
Fax: (414) 482-8001
Email: gademi@ademilaw.com                                  *Attorneys for Plaintiff*

*Attorneys for Plaintiff*